MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: fpetersen@mcrazlaw.com
dhindman@mcrazlaw.com
irothschild@mcrazlaw.com
ecfbk@mcrazlaw.com

By: Frederick J. Petersen #019944
David J. Hindman, #024704
Isaac D. Rothschild, #025726

Proposed Attorneys for Debtor In Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| In re:<br><br>COBRA TIRE AND AUTO SERVICE, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:25-bk-11703<br><br>**DECLARATION OF GERALD FLETCHER IN SUPPORT OF FIRST DAY MOTIONS** |
|---|---|

I, Gerald Fletcher, on behalf of Cobra Tire and Auto Service LLC, an Arizona limited liability company ("Debtor" or "Cobra") declares as follows:

1. I am the President/CEO of Fletcher Companies, Inc., which is a Member of Cobra.

2. As the President/CEO of Fletcher Companies, Inc., which is a Member of Cobra, I am familiar with Cobra's general business and financial affairs. I submit this

Declaration based on my personal knowledge of Cobra's books and records in connection with its voluntary petition for relief under Chapter 11, of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), filed on December 4, 2025 (the "Petition Date").

3. I submit this Declaration in support of the factual allegations contained in the following Motions (collectively the "First Day Motions"), filed contemporaneously with this Declaration and to help provide background into Cobra and the financial pressures we have undergone:

    A. *Emergency Motion Authorizing Payment of Pre-Petition Wages, Salaries, and Employee Benefits* ("Wage Motion");

    B. *Application for Approval of Employment of Mesch Clark Rothschild as Attorneys for Debtor in Possession* ("MCR Employment Application");

    C. *Motion for Interim and Final Orders: (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; (II) Establishing Procedures for Providing Deposits to Requesting Utilities; (III) Deeming Utilities to Have Adequate Assurance of Payment; And (IV) Establishing Procedures for Resolving Request for Additional Assurance of Payment* ("Utility Motion");

    D. *Emergency Motion for (1) Interim Order Authorizing Use of Cash and Cash Collateral; (2) Order Scheduling Final Hearing; and (3) Final Order Authorizing Use of Cash and Cash Collateral* ("Cash Collateral Motion"); and

    E. *Emergency Motion to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §105 and 11 U.S.C. §364(b).*

2

Case 2:25-bk-11703-BMW    Doc 15    Filed 12/04/25    Entered 12/04/25 16:39:43    Desc
Main Document    Page 2 of 10

## BACKGROUND OF COBRA TIRE

4. On the Petition Date, Cobra voluntarily petitioned the United States Bankruptcy Court for the District of Arizona (the "Court") for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

5. Cobra is an Arizona limited liability company that was formed in 2018.

6. The Debtor operates an auto repair service in Phoenix, Arizona and Gilbert, Arizona, providing auto repair and tire service in Maricopa County, Arizona.

7. Cobra is headquartered at 1500 E. Bethany Home Rd. Phoenix, Arizona 85014.

## EVENTS LEADING TO FILING FOR BANKRUPTCY

8. Cobra has a long history as a profitable company. Although Cobra was formed in 2018, the Fletcher family has been involved in the automotive repair industry in Arizona for approximately 55 years, serving in retail, fleet, and mining customers. During this time, the Fletcher family has operated under different entities, including Fletcher's Tire and Auto Service, and most recently Cobra Tire and Auto Service.

9. Prior to 2024, Cobra was operating two locations; one in central Phoenix and one in Gilbert, Arizona. In the spring of 2024, Cobra expected a significant volume increase from its largest customer, who had contracts relating to Amazon's delivery fleet. To handle the expected increase in volume, Cobra expanded and during 2024 opened two additional facilities known as University and Gibson.

10. Cobra borrowed approximately $1.5 million for equipment and installation as part of the build out at the University and Gibson locations.

11. Thereafter, Cobra experienced only approximately 25% of the anticipated increase in business relating to the Amazon delivery fleet. This lower than anticipated volume of vehicles caused Cobra to lose approximately $250,000 per month.

12. Cobra expected the cash shortfalls and losses to be temporary until the expected volume of business relating to the Amazon delivery fleet was realized. In order to bridge the cash shortfalls, Cobra obtained working capital financing through high-interest merchant cash advance ("MCA") or factoring loans.

13. From early 2025 through the summer of 2025, Cobra continued to obtain working capital financing through additional MCA loans.

14. By May 2025, Cobra's primary parts supplier, NAPA, put Cobra's account on COD as a result of Cobra's difficulty in keeping payments current.

15. Despite representations that delivery vehicle volume would increase, Cobra did not receive an increase in vehicle volume and Cobra's cash situation continued to decline throughout 2025.

16. In September 2025, significant rainstorms caused the roof of the University building to collapse and flooding in the office area. As a result, Cobra ceased operations at the University location.

## STATEMENTS IN SUPPORT OF FIRST DAY MOTIONS

**A.  Emergency Motion to Pay Pre-Petition Wages, Salaries, and Employee Benefits**

17. The Debtor employs 32 individuals as of the Petition Date, Lisa Jordan is an insider (my spouse), she is a Vice President overseeing personnel and payroll and receives an estimated $800.00 per week in salary. As President, I am also an insider who oversees the operation of Cobra and receive an estimated $800.00 per week in salary. Without this workforce, the Debtor could not continue to operate its business. A list of Cobra's workforce is attached as Exhibit A to the Wage Motion.

18. In the ordinary course of business, the Debtor relies on its workforce to conduct its business operations, and the Debtor incurs compensation obligations to such workforce.

4

19. The Debtor's employees are paid weekly based on the previous week period. The Debtor's last full weekly pay period commenced November 23, 2025 and ended on November 29, 2025. In the ordinary course of business, wages that accrued during that pay period were paid on December 4, 2025. The next scheduled pay dates are December 10, 2025, for wages incurred November 30, 2025, through December 6, 2025, and December 17, 2025, for wages incurred December 7, 2025, through December 13, 2025.

20. Pre-petition wages for current pay periods are estimated to be no more than approximately $28,905.23 in total for all of Debtor's 32 employees.

21. Cobra is required by law to withhold from each employee's paycheck certain amounts related to federal, state, and local income taxes as well as social security and Medicare taxes (collectively, the "Withholding Taxes") for remittance to the appropriate taxing authorities.

22. Cobra's employees perform a variety of critical functions, including the operation of Cobra's business. The Employees' skills, knowledge, and understanding of Debtor's business are among its most valuable assets. If the employees do not receive pre-petition compensation and benefit amounts in the ordinary course, they will suffer personal hardship and unnecessary distraction from their duties. Such a result would destroy Employee morale and may result in unmanageable employee turnover, causing immediate and pervasive damage to Cobra's ongoing business operations. Any significant deterioration in morale at this time will substantially and adversely affect the Debtor and its ability to function, resulting in immediate and irreparable harm to the Debtor and its bankruptcy estate.

**B.   Application to Employ Mesch Clark Rothschild as Counsel for Debtor**

23. The Debtor wishes to employ Mesch Clark Rothschild ("MCR"), attorneys who have applied to practice in this court.

24. The Debtor has selected MCR for the reason that it believes MCR is well qualified to represent it as a Debtor in Possession in this case.

25. The professional services MCR is to render include:

    A. To give the Debtor legal advice with respect to its powers and duties in the continued operation and management of its property.

    B. To take required action to recover certain property and money owed to the Debtor, if necessary.

    C. To prepare on behalf of the Debtor, the necessary applications, answers, complaints, orders, reports, disclosure statement, plan of reorganization, motions, and other legal documents.

    D. To perform all other legal services the Debtor deems necessary.

26. To the best my knowledge, MCR has no connection with the creditors, or any other party in interest, or their respective attorneys in this case, as set forth in the Verified Statement of Isaac D. Rothschild ("Statement") filed with the Employment Application.

27. As of the date of filing of the bankruptcy petition, the Debtor did not owe anything to MCR for pre-petition services and costs.

28. The Debtor is informed that the hourly rates for the services of the MCR attorneys and staff who may work on these cases are as follows:

| | |
|---|---|
| Frederick J. Petersen | $575 |
| David J. Hindman | $525 |
| Isaac D. Rothschild | $525 |
| Other Attorneys | $295 - $650 |
| Paraprofessionals | $125 - $265 |

29. The stated hourly rates are subject to periodic adjustment.

30. MCR will seek reimbursement in full for all reasonably incurred expenses, including, without limitation, travel costs, long-distance calls, courier and express mail

6

Case 2:25-bk-11703-BMW    Doc 15    Filed 12/04/25    Entered 12/04/25 16:39:43    Desc
Main Document    Page 6 of 10

costs, special or hand deliveries, copying costs, document processing, court fees, transcript costs, and other expenses.

31. MCR will be compensated as provided by the U.S. Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court, any order regarding professional compensation entered in this case, and subject to an order of this Court approving the fees and costs incurred by MCR.

**C.  Utility Motion**

32. In the ordinary course of business, the Debtor obtains gas, electric, data/internet and other similar utility services provided by a number of utility companies (the "Utility Providers").

33. The Utility Providers service the Debtor's facilities across the country. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and reorganization efforts. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to provide care to patients. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 case.

34. By the Utility Motion, the Debtor seeks entry of an order determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures;

7

Case 2:25-bk-11703-BMW    Doc 15    Filed 12/04/25    Entered 12/04/25 16:39:43    Desc
Main Document    Page 7 of 10

and determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

35. Such relief is necessary to enable the Debtors to continue their business operations uninterrupted by threats of potential termination of, suspension or interruption in utility services. Accordingly, I believe, and the Debtors submit, that the relief requested in the Utilities Motion is in the best interests of the Debtors, its estate and creditors, and all parties in interest and, as such, should be approved.

### D. Cash Collateral Motion

36. The Debtor needs immediate authority to use the Cash Collateral to fund its day-to-day operations and ultimately achieve a successful reorganization. The Debtor requires the use of Cash Collateral for the payment of the operating expenses included in the Budget. The expenses included in the Budget are reasonable and necessary business expenses which must be paid in order to maintain and preserve the Debtor's assets and to continue the operation of its business.

37. As of the Petition Date the Debtor owes Alliance Bank approximately $680,000.00.

38. The Debtor also had incurred certain equipment loans with North Mill Credit Trust, Pathward. The Debtor asserts that there is no equity in any purported secured loan beyond Alliance Bank, North Mill Equipment Finance (the Debtor owes approximately $680,000), and Pathward ($976,000).

39. The Debtor incurred more than 17 MCA or factoring loans in 2025 most incurred to continue servicing the debt of others. It is impossible to tell which of these factoring lenders perfected their interest and when as most UCC-1s filed do not identify the Lender. The Debtor has approximately $3,000,000 on its books as debts owed to these lenders although the Debtor estimates less than $2,000,000 was actually advanced.

40. As of the Petition Date, the Debtor estimates its accounts receivables at $61,443.72 and the cash in its accounts at approximately $10,000.

41. All purported blanket liens or other interest in the Debtor's cash or receivables other than Alliance Bank is unsecured as of the Petition Date

42. Pre-bankruptcy the Debtor has expended as much as $200,000 per month to service to these factoring loans.

43. Without the ability to use Cash Collateral, the Debtor may be forced to terminate its employees and close its business.

44. The failure to obtain authorization for the use of the Cash Collateral will be fatal to the Debtor and disastrous to its creditors, both secured and unsecured.

45. I believe the Cash Collateral Budget is an appropriate estimate of revenue and expenses.

**E.      Post-Petition Financing**

46. In consultation with the Debtor's professionals and management, we have determined that financing will be necessary to fund operating shortfalls during the pendency of the Bankruptcy.

47. The Debtor projects operating shortfalls of approximately $11,750 in December 2025. In addition, the bankruptcy filing is likely to result in some vendors requiring C.O.D. payments, which payments are not accounted for in the Debtor's budget and could further disrupt Cobra's ability to pay post-petition operating expenses without first obtaining financing.

48. The Debtor projects that it will operate profitably each month beginning in January 2026.

49. The Debtor has been offered post-petition financing of up to $75,000 from Gerlad Fletcher and Lisa Jordan, for use to cover ordinary course operating expenses, utility

deposits, cash on delivery payments, and similar charges to bridge the initial period of operating shortfalls and enable the Debtor to reach more profitable operating periods beginning in early 2026.

50. This financing is being offered to the Debtor without interest accruing, subject to the lenders receiving an unsecured administrative expense claim under 11 U.S.C. §503(b).

51. The Debtor, after consulting with its restructuring professionals and management, has concluded in its business judgment that the proposed financing is necessary to preserve and ultimately to maximize the value of the Debtor's estate for the benefit of all stakeholders, and is an exercise of sound business judgment.

I make this declaration under penalty of perjury under the laws of the United States.

DATED: December 4, 2025

*[signature]*

GERALD FLETCHER

4937-0019-5195, v. 1